

KOH
CRC: USAO 2020R00596

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. 21-cr-00250-GJH |
| | * | |
| BRANDON FITZGERALD-HOLLEY, | * | (Wire Fraud, 18 U.S.C. § 1343; Money |
| | * | Laundering, 18 U.S.C. § 1957; |
| Defendant | * | Forfeiture, 18 U.S.C. §§ 981(a)(1)(C) |
| | * | and 982(a)(1), 21 U.S.C. § 853, and 28 |
| | * | U.S.C. § 2461)) |
| | * | |

*******

## INDICTMENT

The Grand Jury for the District of Maryland charges that:

### COUNTS ONE AND TWO
(Wire Fraud)

At all times relevant to this Indictment:

### The Defendant

1. Defendant **BRANDON FITZGERALD-HOLLEY** ("**FITZGERALD-HOLLEY**") was a resident of Suitland, Maryland, until in or around August 2020. Thereafter, ]starting in or around August 2020, **FITZGERALD-HOLLEY** was a resident of Virginia.

### Relevant Individuals and Entities

2. The Coalition for Social Justice and Reform Incorporated ("the Coalition") was registered with the Virginia State Corporation Commission as a nonprofit organization. The Defendant, **FITZGERALD-HOLLEY**, was the Chief Executive Officer ("CEO") of the Coalition.

### The Paycheck Protection Program

3. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a

federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

4. In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation showing their payroll expenses.

5. A PPP loan application was required to be processed by a participating lender, such as a financial institution. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were 100% guaranteed by the Small Business Administration ("SBA"). Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

6. PPP loan proceeds were required to be used by the business on certain permissible

expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time and used a certain percentage of the PPP loan proceeds on payroll expenses.

**The Economic Injury Disaster Relief Program**

7. The Economic Injury Disaster Loan ("EIDL") program was an SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

8. Another source of relief provided by the CARES Act was the authorization for the SBA to provide EIDLs to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic. In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses within three days of applying for an EIDL. The amount of the advance was determined by the number of employees the applicant certified having. The advances did not have to be repaid.

9. In order to obtain an EIDL and advance, a qualifying business was required to submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDLs for COVID-19 relief, the 12-month period was that preceding January 31, 2020. The applicant was required to also certify that all the information in the application was true and correct to the best of the applicant's knowledge.

10. EIDL applications were submitted directly to the SBA and processed by the

3

agency with support from a government contractor. The amount of the loan, if the application was approved, was determined based, in part, on the information provided by the application about employment, revenue, and cost of goods, as described above. Any funds issued under an EIDL or advance were issued directly by the SBA. EIDL funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments. If the applicant also obtained a loan under the PPP, the EIDL funds could not be used for the same purpose as the PPP funds.

## Relevant Financial Institutions

11. Institution 1 was an online financial technology company that specialized in small business lending. Institution 1 participated as a non-bank PPP lender to small businesses. Institution 1 utilized servers in Virginia for processing PPP loans.

12. Bank 1 was a federally-insured financial institution with branches throughout the United States, including in the District of Maryland. **FITZGERALD-HOLLEY** maintained at least two accounts at Bank 1.

13. Bank 2 was a federally-insured financial institution. **FITZGERALD-HOLLEY** maintained at least two accounts at Bank 2 in the name of the Coalition.

## The Scheme to Defraud

14. Between in or around March 2020 and continuing until in or around October 2020, the Defendant,

**BRANDON FITZGERALD-HOLLEY,**

did knowingly and willfully devise and intend to devise, and with the intent to defraud, a scheme and artifice to defraud the SBA and Institution 1, and to obtain money and property by means of

materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing and attempting to execute the scheme to defraud, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, pictures, and sounds, as further described below, in violation of 18 U.SC. § 1343.

### Purpose of the Scheme to Defraud

15. It was the purpose of the scheme to defraud for **FITZGERALD-HOLLEY**: (1) to unjustly enrich himself and others by fraudulently obtaining EIDL and PPP loan proceeds; and (2) to conceal his misappropriation of the PPP loan proceeds by laundering them through other accounts.

### Manner and Means of the Scheme to Defraud

#### EIDL Loan Application for the Coalition

16. On or about March 31, 2020, **FITZGERALD-HOLLEY** submitted and caused the submission of an application to the SBA on behalf of the Coalition for an EIDL loan in the amount of $150,000, as well as an EIDL advance. The loan application listed **FITZGERALD-HOLLEY** as the CEO of the Coalition.

17. On the EIDL loan application, **FITZGERALD-HOLLEY** falsely stated that the Coalition had 25 employees and had $546,000 of gross revenue and $500,000 of nonprofit costs for the 12-month period prior to the COVID-19 pandemic.

18. In connection with the EIDL application, **FITZGERALD-HOLLEY** provided the SBA with the number of an account at Bank 1 ending in 6421 ("Bank 1 Account 6421"), and falsely indicated that this account was in the name of the Coalition. In reality, Bank 1 Account 6421 was **FITZGERALD-HOLLEY**'s personal account. At the time he submitted the EIDL application, **FITZGERALD-HOLLEY** was the only signatory on the account.

19. On or about June 3, 2020, the SBA denied the Coalition's application for an EIDL loan. On or about June 13, 2020, **FITZGERALD-HOLLEY** contacted the SBA to request reconsideration of the EIDL application on behalf of the Coalition. Within the request for reconsideration, **FITZGERALD-HOLLEY** provided new bank account for the Coalition, which was an account at Bank 2 ending in 2073 ("Bank 2 Account 2073").

20. **FITZGERALD-HOLLEY** opened Bank 2 Account 2073 on or about June 13, 2020 in the name of the Coalition. **FITZGERALD-HOLLEY** signed the account opening documentation for Bank 2 Account 2073 as the president of the Coalition and was listed as the sole signatory.

21. On or about June 12, 2020, the SBA denied the Coalition's request for reconsideration of its EIDL loan advance. To date, the SBA has not issued the EIDL loan or advance to the Coalition.

PPP Loan Application for the Coalition

22. On or about June 13, 2020, **FITZGERALD-HOLLEY** submitted an application to Institution 1 for a PPP loan in the amount of $305,854. The application listed **FITZGERALD-HOLLEY** as the CEO of the Coalition.

23. On the PPP loan application, **FITZGERALD-HOLLEY** again falsely represented that the Coalition had 25 employees. **FITZGERALD-HOLLEY** also falsely stated that the Coalition had average monthly payroll costs of $122,342.

24. On or about June 11, 2020, **FITZGERALD-HOLLEY** submitted a fraudulent IRS Form W-3 Transmittal of Wages and Tax Statement ("Form W-3") for the tax year 2019 to Institution 1 to support the Coalition's PPP loan application. The IRS Form W-3 was dated March 12, 2020, and was signed by **FITZGERALD-HOLLEY** on behalf of the Coalition.

25. The Form W-3 falsely stated that the Coalition had 25 employees with total wages of $1,385,000 for the tax year 2019.

26. In addition, **FITZGERALD-HOLLEY** submitted a fraudulent IRS Form 940 Employers Annual Federal Unemployment Tax Return ("Form 940") for the tax year 2019, which listed **FITZGERALD-HOLLEY** as the CEO of the Coalition.

27. On or about June 13, 2020, the Coalition's PPP loan application was approved. **FITZGERALD-HOLLEY** signed the note to the SBA as the CEO of the Coalition.

28. On or about June 16, 2020, Institution 1 sent $305,854 in PPP loan proceeds via interstate wire into **FITZGERALD-HOLLEY's** personal checking account, Bank 1 Account 6421.

## The Charges

29. On or about the dates listed below, in the District of Maryland and elsewhere, the Defendant,

**BRANDON FITZGERALD-HOLLEY,**

did knowingly and willfully, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises, and omissions, transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, pictures, and sounds for the purpose of executing the scheme and artifice to defraud, as set forth below:

| COUNT | APPROXIMATE DATE | DESCRIPTION OF WIRE |
|---|---|---|
| 1 | June 11, 2020 | Interstate wire transmission caused by **FITZGERALD-HOLLEY**, in Maryland, submitting Form W-3 to Institution 1, outside of Maryland. |
| 2 | June 16, 2020 | Interstate wire transmission caused by transfer of $305,854 representing PPP loan disbursement, from Institution 1, outside of Maryland, to **FITZGERALD-HOLLEY** Bank 1 Account 6421, in Maryland. |

18 U.S.C. § 1343

## COUNT THREE
### (Money Laundering)

The Grand Jury for the District of Maryland further charges that:

1. The allegations in Paragraphs 1 through 27 of Counts One and Two are re-alleged and incorporated as if fully set forth herein.

2. On or about June 22, 2020, in the District of Maryland and elsewhere, the Defendant,

**BRANDON FITZGERALD-HOLLEY,**

did knowingly engage and attempt to engage in a monetary transaction, by, through, and to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is, a transfer and withdrawal of funds—to wit, a cashier's check drawn on Bank 1 account ending in -9825 in the amount of $75,799, to purchase a 2020 Dodge Charger that is registered to **FITZGERALD-HOLLEY**—such property being derived from a specified unlawful activity, that is, wire fraud in violation of 18 U.S.C. § 1343, as described in Counts One and Two of this Indictment.

18 U.S.C. § 1957

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1. Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to the Defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. §§ 981(a)(1)(c) and 982(a)(1), and 28 U.S.C. § 2461(c), in the event of the Defendant's convictions on any of the offenses charged in Counts One through Three of this Indictment.

### Wire Fraud Forfeiture

2. Upon conviction of the offenses set forth in Counts One and Two of this Indictment, the Defendant,

**BRANDON FITZGERALD-HOLLEY,**

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, constituting or derived from, proceeds traceable to the offenses.

### Money Laundering Forfeiture

3. Upon conviction of the offenses set forth in Count Three of the Indictment, the Defendant,

**BRANDON FITZGERALD-HOLLEY**

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in such offense, or any property traceable to such property.

## Property Subject to Forfeiture

4. The property to be forfeited includes, but is not limited to, a money judgment of at least $305,854 in U.S. currency equal to the total proceeds obtain by the Defendant as the result of his offenses and the following property to be forfeited in partial satisfaction of the money judgment: a 2020 Dodge Charger Scat, Vehicle Identification Number 2C3CDXGJ5LH128652 seized during execution of a search and seizure warrant at the Defendant's residence in Fredericksburg, Virginia on or about October 28, 2020.

## Substitute Assets

5. If any of the property described above as being subject to forfeiture, as a result of any act or omission of any defendant:

    a. cannot be located upon exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C.

§ 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

18 U.S.C. § 981(a)(1)(C)
18 U.S.C. § 982(a)(1)
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

*Jonathan Lenzner /CRE*
_____
Jonathan F. Lenzner
Acting United States Attorney

*Joseph Beemsterboer /CRE*
_____
Joseph S. Beemsterboer
Acting Chief, Fraud Section
Criminal Division, Department of Justice

**SIGNATURE REDACTED**
Foreperson

Date: 7/7/21